# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **MELANIE BECKEMEYER**, | ][ | CASE NO.  1:17-cv-00695 |
| | ][ | |
| Plaintiff, | ][ | JUDGE BARRETT |
| | ][ | |
| v. | ][ | |
| | ][ | **DEFENDANT'S MOTION TO** |
| **GELCO CORPORATION,** *etc.*, | ][ | **EXCLUDE THE OPINIONS AND** |
| | ][ | **TESTMONY OF PLAINTIFF'S** |
| Defendant. | ][ | **EXPERT SCOTT W. MCMAHON, M.D.** |
| | ][ | |

In accordance with Rule 702 of the Federal Rules of Evidence, Defendant respectfully moves this Court to exclude the opinions and report of Plaintiff's expert Scott W. McMahon, M.D. (Doc # 57-2.)  Dr. McMahon's exposure opinions are wholly unreliable and misinterpret the inspection and lab results of Steve Rucker, CIH; he engages in symptom-based, temporal "backwards toxicology" by attempting to "reverse extrapolate" levels of exposure to establish the presence of mold in the RAV4 at the time of Plaintiff's use, though there is no data or methodology to support such conclusions; and, his general and specific causation opinions are flawed, unreliable and inadmissible under *Daubert*.  A Brief in Support is attached hereto.

Respectfully submitted,

*/s/Colin P. Sammon*
MICHAEL A. PAGLIA, ESQ. (0070542)
COLIN P. SAMMON, ESQ. (0076011)
**RITZLER COUGHLIN & PAGLIA, LTD.**
1360 East Ninth Street
1000 IMG Center
Cleveland, OH  44114
Office (216) 241-8333
Facsimile (216) 241-5890
csammon@rcp-attorneys.com
*Attorneys for Defendant Gelco Corporation*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **MELANIE BECKEMEYER**, | ][ | CASE NO.  1:17-cv-00695 |
| | ][ | |
| Plaintiff, | ][ | JUDGE BARRETT |
| | ][ | |
| v. | ][ | |
| | ][ | **MEMORANDUM IN SUPPORT OF** |
| **GELCO CORPORATION**, *etc.*, | ][ | **DEFENDANT'S MOTION TO** |
| | ][ | **EXCLUDE THE OPINIONS AND** |
| Defendant. | ][ | **TESTMONY OF PLAINTIFF'S** |
| | ][ | **EXPERT SCOTT W. MCMAHON, M.D.** |

## I.     INTRODUCTION

In this action, Plaintiff alleges she was injured during the course of periodically driving her company-issued Toyota RAV4 from May 6, 2016 through September 23, 2016.  She alleges that the RAV4 was contaminated or infested with mold or bacteria, and that her inhalation exposure to that contamination caused her to suffer physical effects including an invented condition which is not a generally recognized medical condition - "Chronic Inflammatory Response Syndrome" - and even brain injury.

Science and case law hold that an objective physician or scientist would not – and could not – determine that a plaintiff's alleged illness was caused by exposure to mold or bacteria without first having the exposure data during the relevant time of exposure.  In this case, there is no dispute that such exposure data is nonexistent.  Plaintiff's last date of possession of the RAV4 was September 23, 2016.  It was then stored and sold at an auction on October 19, 2016.  It was then sold in November 18, 2016, to Deborah and Henry Ahaus of Sunman, Indiana.  In January 2017, Roger Butler of Frankfort, Indiana, purchased the RAV4 from Del Real, a used car dealership in Frankfort.  Mr. Butler traded the RAV4 in to Rohrman Subaru after logging

approximately 6,000 miles on it.  On July 9, 2018 – some twenty-two months after Plaintiff last operated the RAV4 and five owners (including dealerships) later – Plaintiff's Industrial Hygienist Steve Rucker inspected the RAV4.  As established in the Motion to Exclude the Report and Opinions of Steven Rucker and the Reply Brief, even if the testing of Mr. Rucker is reliable – which is not the case – such data is wholly unreliable to establish any mold data as to the RAV4 as it existed at the time of Plaintiff's alleged exposure.

Defying basic logic and common sense, Plaintiff's sole medical expert Scott W. McMahon, M.D. has authored a report (Doc # 57-2) in which he attempts to establish the existence of mold in the RAV4 at the time Plaintiff used it in 2016, though no such objective data exists.   Dr. McMahon is not an industrial hygienist, he is not a toxicologist, he is not an internal medicine doctor or a specialist in allergy and immunology.  He is a pediatrician, unqualified to testify on the presence of mold, mycotoxins, endotoxins, or any other organic source in the RAV4 in 2016.  Dr. McMahon's methodology is not generally recognized, is flawed and unreliable.  Working not from any reliable, objective data regarding the RAV4 in 2016, Dr. McMahon comes to conclusions based solely on Plaintiff's reported symptoms that the RAV4 was "water damaged", even though there is a complete lack of evidence supporting such a conclusion.  No witness, other than Dr. McMahon – who has never visually inspected the vehicle – has claimed that the RAV4 was "water damaged."

In addition to his unqualified, flawed opinion that mold existed in the RAV4 in 2016, McMahon's opinions regarding his diagnosis of CIRS is unreliable as he failed to consider and rule out alternative causes of Plaintiff's symptomology.

## II.    DR. MCMAHON'S FLAWED REPORT AND OPINIONS

### A.    Exposure Opinions

Dr. McMahon sets forth his own, flawed interpretation of Mr. Rucker's environmental testing at in his Report at pages 12-14 and pages 15-16, under a section called "Environmental History." (Doc #57-2, PAGEID 1521-1525.)   These opinions are flawed and unreliable for numerous reasons.   First, the testing relied on was from July 2018, some 22 months after Plaintiff's last use of the RAV4.  Second, Dr. McMahon states without any reference or scientific support that "Endotoxin is produced by numerous bacteria and elevated endotoxin levels confirm bacterial growth which confirms water damage and microbial amplification."   (Doc #57-2, PAGEID 1521.)  Dr. McMahon believes that Mr. Rucker obtained "controls . . . from the engine block" and that "swab dust samples from the block (controls) showed no mold at all." (*Id.*)  He continued, "The polycarbonate membrane filter samples looked for endotoxin levels.  As above, the engine block had no endotoxin, or such a low amount it was not detectable by this method." Dr. McMahon interpreted the dust samples from the passenger and driver carpets as "The Driver Carpet – IE revealed 189 EU/sample and the Driver Carpet – 2E revealed 816 EU/sample.  Both are low amounts but significantly higher than the control level", again, his belief that the controls were obtained from the engine block.  (*Id.* at PAGEID 1522.)  He then says that the passenger carpet samples showed "very high totals", and that "using relative measuring, these two samples had 204,400 EU/m2 and 285,700 EU/m2, respectively, where a high level is considered >107,000 EU/m2." (*Id.*)  There is no citation to any journals, published guidelines, standards, or studies to support his statements on this point.  Dr. McMahon continues, "Elevated endotoxin levels confirm bacterial amplification."   (*Id.*)   Then he admits the following, making an erroneous and fatal assumption:

> These results were obtained more than a year after Dr. Beckemeyer ceased driving the Rav 4.  Presumably, the Rav 4 was not being driven during that time and additional water had no access into the Rav 4, near the visor or via the A/C.  If there had been previously

> wetted areas, capable of supporting mold and bacteria growth, they would now be dried up.  The results presented above are consistent with water damage causing microbials (fungal and bacterial) amplification and confirms the Rav 4 was water-damaged.

(*Id.* at PAGEID 1522.)   Dr. McMahon, it seems, also relied on Mr. Rucker's hypothesis regarding route exposure, which Mr. Rucker could have, but never tested.  (Doc # 59, PAGEID 1743.)

But Mr. Rucker, the Industrial Hygienist, testified that there was no evidence that the RAV4 was ever water damaged.  (Doc #59, PAGEID 1731, 1763.)  He saw no evidence of any water intrusion that had occurred at any time.  (Doc #59, PAGEID 1736.)  Mold and bacteria both require water to thrive and grow, and without any water source they die after their food source is used.  (*Id.*)  Mr. Rucker also opined that after his testing, the Rav 4 did not have elevated levels of any mold.  (Doc #59, PAGEID 1729-1730.)  Mr. Rucker denied he took samples from the RAV4's engine block, and that if someone interpreted his report that way it was be a misinterpretation.  (*Id.* at PAGEID 1750.)  Contrary to Dr. McMahon's opinions, Mr. Rucker testified there was no amplified mold growth, no elevated spore counts, and no evidence of condensation problems in the RAV4.  (*Id.* at PAGEID 1752.)  Also contrary to Dr. McMahon's interpretation, Mr. Rucker testified that there was no evidence of elevated levels of *Alternaria*, *Basidiomycetes*, or *Penicillium*.  Mr. Rucker also testified that *Chaetomium* is found indoors and outdoors and, while it does require moisture to support growth, "if we had seen a higher count of Chaetomium, then we would look for a moisture source that could support that organism."  (*Id.*, at PAGEID 1752-1753.)  He admitted that because there were no moisture sources to support *Chaetomium* found in the vehicle, "it was regular ambient background."  (*Id*, at PAGEID 1753.)

Mr. Rucker also agreed that there is no way to take the results of his inspection and sampling and render any conclusions about the condition of the Rav 4 in 2016, during Plaintiff's use. (Rucker Dep., Doc #59, at PAGEID 1733-1734.) "I cannot put a temporal relationship to when the endotoxin was under the seat." (Id., at PAGEID 1734.) Mr. Rucker could not state to any degree of scientific probability that the Rav4 when Plaintiff drove it contained any endotoxin. (Id. at PAGEID 1755, "I don't know whether it did or whether it did not.") He is not familiar with any literature supporting any methodology for determining when this endotoxin first existed. (Id.) Endotoxins are ubiquitous. (Id.) Rucker testified that endotoxin is associated with gram negative bacteria, but he was unable to identify the source material for the samples he collected. (Id.; also, at PAGEID 1758, when asked if he knew the source bacteria, "I do not."). He admits that the sampling and testing he did only reflect the condition of the Rav4 as of July 9, 2018 – nearly 2 years after the Plaintiff last had possession of it. (Doc # 59, PAGEID 1716-1717.) Mr. Rucker further admits that he's not seen any data regarding the condition of the Rav4 as far as endotoxin or mold testing at any time prior to his testing performed on July 9, 2018. (Id. at PAGEID 1717.) He admits that there is no data showing there was endotoxin in the Rav4 in 2016. (Id. at PAGEID1756.) Even if had such data, which he doesn't, there are no federal mold or endotoxin levels. (Id. at PAGEID 1741.) Rucker simply does not know what the levels were or whether the endotoxin he found in July 2018 were harmful. (Id. at PAGEID 1764.)

Mold and bacteria are ubiquitous. They are everywhere and it is patently unreasonable, not to mention impossible, to expect a mold-free or bacteria-free environment. (Jeremy Porter Affidavit, attached hereto as Exhibit 1; Ronald Gots, M.D., Affidavit, attached hereto as Exhibit 2; Andrew Saxon, M.D., Affidavit attached hereto as Exhibit 3.) Here, there is no data on which to form any scientifically-based opinion as to the level of mold in the RAV4 in 2016. (Porter

6

Aff., at pg. 4-5; Saxon Aff., at ¶ 10).  Dr. Saxon explains that surface tests for mold, such as performed by Steve Rucker, may be relevant for remediation purposes but "there is no way to determine or even estimate the levels of human exposure form such sources and to do so is speculation and not generally accepted methodology for assessing human exposure."  (Saxon Aff., at 10.)  This is consistent with common sense and with Mr. Rucker's testimony.

Moreover, the air sampling must be in a relevant timeframe "in terms of when the individual was in the location sampled.  One cannot sample locations months or years after the individual was there and say what was present when the subject was there." (*Id.*)  Mr. Porter agrees.  (Porter Aff., at 4-5.)  Mr. Porter explains that air sampling levels "showed mold spore counts well below an established standard (1300 spores/$M^3$ found vs. the standard of 2400 spores/$M^3$).  According to Dr. Saxon, for any toxic effect from exposure to mold or its byproducts, it would take the most severe and extreme contamination, i.e., "all mold spores making the most potent known mycotoxin, inhalation maximum amount 24/7, all spores breathed deposited and 100% of toxin absorbed", but even under such conditions "it would take between 30,000 to > 1,000,000 spores/$m^3$ to have an adverse health effect." (Saxon Aff., at ¶ 5(C)(ii).) Compared to what was found in the RAV4 in 2018, 1300 spores/$m^3$ with the majority of spores being entirely harmless, means that "the level of potential mycotoxin producing spores in the RAV4 when tested "was thousands of times below that at which any mycotoxin related adverse health effect might occur." (*Id.*; Gots Aff., at ¶ 15.)  According to Dr. Saxon,

> Overall, the generally accepted mechanisms for mold and/or mold byproduct induced adverse health effects are not quantitatively or qualitatively relevant to Ms. Beckemeyer's primary medical issues, i.e. her complaints do not even potentially relate to the generally accepted mechanisms of mold induced adverse health effects other than possibly some mild upper airway allergy.

(*Id.*)   In addition to the sheer lack of dosage level data, Dr. McMahon's employment of a differential diagnosis was considerably flawed in numerous respects.  (Saxon Aff., at ¶ 6; Gots Aff., at ¶ 12; 16; Ernest Chiodo Affidavit, attached hereto as Exhibit 4, at ¶ 36-37.)   Dr. McMahon's testing was flawed since it adjusted norms and generally is not accepted methodology for "any purpose in clinical medicine much less for the purpose for which he employs them." (Saxon Aff., at ¶ 7(B); Gots Aff., at ¶ 27, 34.)  The CIRS diagnosis is not a medically accepted diagnosis. (Saxon Aff., at ¶ 7(A); Chiodo Aff., at 34; Gots Aff., at ¶ 14.)

On top of these significant deficiencies in Dr. McMahon's methodology, there is simply "no data regarding mold or other microbial materials in vehicle in question during Ms. Beckemeyer's period of use in 2016 much less any data that the amounts were at a level sufficient to cause adverse human health effect." (Saxon Aff., at ¶ 10.)  In this regard, Dr. Saxon explains that it is "impossible to derive a valid opinion as to Ms. Beckemeyer's vehicular exposure based on data obtained twenty-two months or later after her last known use." (*Id.*; *see also* Gots Aff., at ¶ 15; Porter Aff., at 4-5; Chiodo Aff., at ¶ 31).

### B.   Medical Opinions

Dr. McMahon's methodology for determining that one and only one diagnosis can explain the symptoms that Plaintiff has shown is likewise flawed and unreliable.  At the most basic level, the medical community does not recognize the diagnosis of CIRS, which is a diagnosis that was invented by Richie Shoemaker, M.D., but that is not a generally accepted entity in the medical community.  (Saxon Aff., at ¶ 7, Pg. 11-12; Gots. Aff., at ¶ 14.)  Dr. Saxon explains, "The claim that CIRS is a self-sustaining reaction of the innate immune system is a fatally flawed idea that is in direct conflict with what is known about the human innate immune system." (*Id.*, at ¶ 7, Pg. 12.)  Dr. Gots explains that CIRS "is not recognize by any body of

toxicologists even though the claim is that mycotoxins are the initiator of this alleged disorder. (Gots Aff., at ¶ 14.) Moreover, the battery of tests employed by Dr. McMahon to support his diagnosis are "not generally accepted methodology for any purpose in clinical medicine much less for the purpose for which he employs them." (Saxon Aff., at ¶ 7, Pg. 12.) Dr. Saxon explains that Dr. McMahon deviates from the entire scientific and medical communities by claiming there is no detectable lower limit for an exposure that can induce CIRS. (*Id.*) Allowing such testimony, Dr. Saxon explains, "in general fail[s] to follow dose response relationships [and] is mistaken and in direct contrast what is known." (*Id.*) Dr. Gots echoed this analysis, explaining that an "immutable principle of toxicology is that toxicity depends upon the dose of the toxic agent which enters the body." (Gots Aff., at ¶ 15.) As to exposure to mycotoxins, the "calculated doses required for both acute and chronic exposures to result in adverse health effects in humans has been studied and written about in peer reviewed articles and are so high that it is essentially impossible for exposure in home, let alone a car, to ever lead to a toxic adverse human health effect." (*Id.*) Indeed, Dr. Saxon points out an illogical flaw in the diagnosis of CIRS by Dr. McMahon, being that according to Dr. McMahon "CIRS only occurs with indoor exposure" to mold, that is, CIRS cannot be diagnosed based on exposure to outdoor molds. (Saxon Aff., at ¶ 7, Pg. 12.) In this regard, "Dr. McMahon's belief that CIRS can explain everything that troubles Ms. Beckemeyer (or anyone else) is based on the fact the hypothetical construct of CIRS that has no boundaries. As a result, the rubric of CIRS, such as it is, can be applied to any person to explain all alleged issues, i.e., its all-encompassing, and becomes meaningless it does not represent a separately definable disease process." (*Id.*) Because of this, Dr. Saxon explains that in applying his "differential diagnosis" (Doc #57-2, PAGEID 1527-1530) Dr. McMahon "is not using differential diagnosis in a valid or acceptable fashion."

(Saxon Aff., at ¶ 7, Pg. 10.) Dr. Chiodo agrees with this, stating that since "Dr. McMahon did not conduct a differential diagnosis of etiology to exclude or minimize the contribution of diseases unrelated to the claimed mold exposure, he did not use the proper methodology that satisfies Daubert to arrive at his opinion of the disease causation as described on pages 613 and 690 of the Reference Manual on Scientific Evidence 3rd Ediation." (Chiodo Aff., at ¶ 36.) Dr. Saxon, Dr. Gots and Dr. Chiodo all agree that Dr. McMahon's analysis of general causation is flawed and unreliable. Even if such opinions were reliable, Dr. McMahon's specific causation opinions are flawed and unreliable. (Gots Aff., at ¶ 16-18; Saxon Aff., at ¶ 9; Chiodo Aff., at ¶ 40.)

### III.  LAW & ARGUMENT

#### A.  Plaintiff Bears the Burden of Establishing the Admissibility of Dr. McMahon's Opinions.

The decision whether to admit expert testimony is subject to this Court's discretion. *General Electric v. Joiner*, 522 U.S. 136, 143 (1997); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). It is the plaintiff's burden to convince this Court by a preponderance of proof that Dr. McMahon's opinions are admissible. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993); *Nelson*, 243 F.3d at 251. This burden is not the same as Plaintiff's burden for overcoming summary judgment: "[o]n a motion for summary judgment, disputed issues of fact are resolved against the moving party . . . . But the question of admissibility of expert testimony is not such an issue of fact." *General Electric*, 522 U.S. at 143.

#### B.  Admissibility Standards for Expert Testimony.

Rule 702 of the Federal Rules of Evidence provides that a witness "qualified as an expert" may offer opinion testimony provided that: "(1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliable to the facts of the case." *General Electric,* 522 U.S. at 143.

In *Daubert*, the United States Supreme Court recognized that because expert testimony "can be both powerful and quite misleading", district courts must act as a "gatekeeper" to "ensure that" expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 592, 595. With regard to the reliability determination, the focus is on whether the expert's testimony reflects "'scientific knowledge' . . . derived by the scientific method," and thus represents "good science." *Id.* at 590, 593.

In making this reliability determination, the *Daubert* court outlined a non-exhaustive list of factors to be considered. These include: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known potential rate of error; and (4) whether the methodology has gained general acceptance. *Daubert*, at 593-594.

This inquiry is flexible and the above factors may or may not apply in a particular case. As a result, courts will consider any number of other factors, such as "whether an expert developed his opinions for the purpose of testifying." *Adams v. Cooper Industries, Inc.*, No. 03-476-JBC, 2007 WL 2210212, at *2 (E.D. Ky. July 30, 2007). Ultimately, whatever factors are considered, the objective is "to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

To establish a *prima facie* case involving exposure to mold, a plaintiff must establish (1) general causation, i.e., that the substance is capable of causing plaintiff's medical condition, and (2) specific causation, i.e., that the substance in fact caused the plaintiff's medical condition. *Terry v.*

*Caputo*, 115 Ohio St.3d 351, Syll. ¶ 1 (2007). Establishing general and specific causation in a toxic tort case "involves scientific inquiry." *Terry*, at Syll. ¶ 2. Therefore, causation must be established by expert testimony. *Id.* Without competent admissible expert testimony on both of these issues, a plaintiff cannot establish a *prima facie* case" and summary judgment is appropriate. *Id.* at Syll. ¶ 3.

In *Terry* the plaintiffs alleged that they suffered headaches and other physical ailments as a result of exposure to mold. *Id.* at 353. The trial court excluded the testimony and opinions of plaintiff's medical causation expert because his opinions "lacked a methodology satisfying *Daubert*." *Id.* at 354. The Supreme Court of Ohio affirmed, finding that the expert's specific causation opinion was based on an "invalid" methodology that, among other things, relied "too heavily on the temporal proximity of the exposure to the onset of symptoms." The court concluded that "[w]ithout expert testimony to establish both general causation and specific causation, a claimant cannot establish a prima facie case of exposure to mold or other toxic substances." *Id.*

In *Kerns v. Hobart Brothers Co.*, 2008 WL 1991909 (Ohio App. 2nd Dist. May 9, 2008), the plaintiff's experts' opinions were ruled "inherently unreliable" because they were based primarily upon the "temporal relationship" between the alleged exposure and claimed injury. *Id.*, at ¶ 95-98. The court also found that plaintiff's specific causation expert inappropriately relied on a "differential diagnosis" even though there were several unknown potential causes for the alleged condition. In upholding exclusion, the court of appeals ruled that the general causation expert used a "nebulous methodology" that was "speculative at best." *Id.* at ¶ 29-49.

While the reliability determination focuses on the methodology, as opposed to the conclusions reached from that methodology, "conclusions and methodology are not entirely distinct from one another." *General Electric*, 522 U.S. at 146. In *General Electric*, an exposure case, the United States Supreme Court affirmed the district court's exclusion of plaintiff's

12

experts. The expert relied on literature that was "so dissimilar to the facts" at issue and drew conclusions form that literature that did not support the opinion. *Id.* at 144-146. The *General Electric* Court summarized: "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion preferred." *Id.*, at 146.

With regard to the specific causation inquiry, Plaintiff must demonstrate "that [she] was exposed to the toxic substance (here, harmful molds) and that the level of exposure was sufficient to induce the complained-of medical condition (commonly called a 'dose-response relationship')." *Valentine*, 158 Ohio App.3d at n. 1. This is why courts have held that an expert who seeks to opine on specific causation must pay careful attention to the dose-response relationship. . . ." *Adams*, 2007 WL 2210212, at *4. In this regard, the dose amount is the basic, foundational requirement for admissibility of causation opinions: "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).

In *Allen*, Walter Allen died of brain cancer known as glioblastoma multiforme after having been a maintenance worker at Baton Rouge General Hospital for over 20 years. During that time, he occasionally replaced cylinders containing ethylene oxide ("EtO"), a chemical commonly used to sterilize heat and moisture sensitive medical and surgical devices. *Id.* at 195. The Court cited a number of reasons why plaintiff's expert's opinions were unreliable; it noted,

> An additional ground for excluding the opinions lies in Federal
> Rule of Evidence 703, which requires that the facts on which the

expert relies must be reasonably relied on by other experts in the field. ***In this case, there is no direct evidence of the level of Allen's exposure to EtO.*** The Kelsey/LaMontagne opinion relies principally on the affidavit of a coworker and on extrapolations concerning EtO handling at the hospital where Allen worked based on conditions in other hospitals in the 1970's. The experts actually knew more about Allen's exposure to EtO through his smoking a pack of cigarettes a day than they did about his occupational exposure to the chemical. Nevertheless, Dr. Kelsey and Dr. LaMontagne discounted the effect of tobacco, while speculating that the workplace exposure was the cause of his brain cancer. Scientific knowledge of the harmful level of exposure to a chemical, plus ***knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.*** See *Wright*, 91 F.3d at 1107. Not only was the scientific knowledge absent, ***but the experts' background information concerning Allen's exposure to EtO is so sadly lacking as to be mere guesswork.*** The experts did not rely on data concerning Allen's exposure that suffices to sustain their opinions under R. 703. See *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1114–1115 (5th Cir.1991) (en banc), cert. denied, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992) (holding that the district court did not abuse its discretion in excluding an expert's opinion that was based on insufficient data regarding the dosage of a harmful substance and the duration of exposure to that substance); *Viterbo v. Dow Chemical Co*., 826 F.2d 420, 423 (5th Cir.1987) (concluding that evidence from animal studies is insufficient based in part on the lack of evidence that the plaintiff was exposed to comparable amounts). See also *Wright*, 91 F.3d at 1107–08 (holding expert opinions inadmissible in the absence of evidence of exposure to toxic substance).

In *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1114–1115 (5th Cir.1991) (en banc), cert. denied, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), abrogated on other grounds by *Daubert*, the plaintiff argued that dosage information was unnecessary when determining individual causation. The Fifth Circuit Court of Appeals disagreed: "If the dosage of the harmful substance and the duration of exposure to it are the types of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in

excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate dosage or duration data."

In *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir., 2011), the District Court's exclusion of plaintiff's expert's opinions as to general and specific causation was affirmed in a benzene exposure case because it failed to meet the requirements of Rule 702 of the Federal Rules of Evidence. The *Pluck* Court found that the expert's opinion made no attempt to determine the amount or dose of alleged exposure and whether it was sufficient to make one ill. *Id.* at *679. "[I]t is well-settled that the mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiff's symptoms." *Id.* citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001) (noting the presence of PCBs in plaintiff's environment "in excess of allowable limits" could not establish causation without evidence that they were "exposed at a level that could cause neurologic and lung impairments"); *McClain v. Metabolife Int'l, Inc.*, 501 F.3d 1233, 1242 (11th Cir. 2005) (causation "requires not simply proof of exposure to the substance, but proof of enough exposure to cause the plaintiff's specific illness").

When examining the relevance prong of the inquiry, *Hooks v. Nationwide Housing Systems, LLC*, 2016 WL 3667134 (E.D. La. July 11, 2016) provides guidance. There, plaintiffs claimed injury from exposure to mold (Aspergillus/Penicillium) in their residence. *Id.* at *1-2, 8.Plaintiffs' exposure expert, Glenn Ray, tested the plaintiffs' residence and determined that the mold was elevated. Defendants moved to exclude Ray's opinions and testimony under *Daubert*. The *Hooks* Court explained the lack of relevance to Ray's testimony as follows:

> It is undisputed that Plaintiffs were not living in the home at the time of either expert's testing. Ray does not form an opinion as to the levels of Aspergillus and Penicillium inside the house while Plaintiffs lived there, nor does he provide a reliable methodology for forming such an opinion. For this reason, the experts' samples provide nothing more than the levels of molds found in the home –

> they do not provide any findings or conclusions as to the severity of the Plaintiffs' exposure to any specific type of mold.  Eve assuming that exposure to Aspergillus and Penicillium at levels higher indoors than outdoors would be harmful, Plaintiffs fail to provide any evidence that they were actually exposed to harmful levels of Aspergillus and Penicillium, or any other type of mold. *See Pratt v. Landings at Barksdale*, No. 09-1734, 2013 WL 5376021, at *4 (W.D. La. Sept. 24, 2013)("It is essential that Plaintiffs demonstrate that they were, in fact, exposed to harmful levels of mold.").

*Id.* at *8.  The *Hooks* Court also excluded plaintiffs' medical experts because they had no exposure data.  *Id.* at *10 ("Thus, neither Dr. Leumas nor Dr. Ghosh have any evidence of the exposure levels the Hooks were exposed to during the time living in the home.").

Even if Plaintiff's Industrial Hygienist report is ruled relevant and reliable, which it is not, Dr. McMahon's reliance on those findings to reverse extrapolate an opinion about the mold levels in the RAV4 some 22 months earlier is so lacking in any methodology as to be inadmissible.  It is in essence "reverse extrapolation", and not recognized as a generally accepted methodology for determining dose response.  Further, such opinion is contrary to Mr. Rucker's testimony which agreed such a method does not exist.  (Doc # 59, PAGEID 1760-1761.)  There is no evidence that mold or endotoxin contamination existed in the RAV4 in 2016, much less to what level.  Without this data, no scientist can form a reliable opinion as to the levels, if any, of harmful mold in the RAV4 on which to base any reliable opinion as to specific causation.

The same holds true for Dr. McMahon's general and specific causation methodology.  As explained by Dr. Saxon,

> As discussed earlier in Section 5, mold and/or mold byproducts and dampness related organisms can cause a limited known adverse health outcomes/medical issues. However, those generally accepted medical effects are not the primary health effects at issue here. At issue in this matter is whether mold/mold byproducts and/or dampness related organisms cause 1) non-infectious neurological conditions including cognitive impairment, 2) generalized somatic symptoms, e.g. fatigue, and/or 3) dizziness/vertigo. The reliable medical literature

16

clearly does not support such conclusions. This is nicely summarized in the analyses of the Institute of Medicine (IOM), "Damp indoor spaces and Health" (Exec summary Table ES-1 and ES2, **Exhibit "2"**), the World Health Organization "Guidelines for Indoor Air Quality: Dampness and Mold." and the Association of Scientific Medical Societies Guideline publication. None of those authoritative documents found even an association between mold or dampness exposure and neurological or generalized somatic symptoms (or a host of other health outcomes.) Indeed the IOM found "*Inadequate or Insufficient Evidence to Determine Whether an Association Exists*" for these endpoints. This is in contrast to respiratory symptoms where there was "*Sufficient Evidence of an Association*" though the IOM did not feel the data reached the level of "*Sufficient Evidence of a Causal Relationship.*"

(Saxon Aff., at ¶ 8; *see also* Gots Aff., at ¶ 12.)  Dr. McMahon did not employ proper methodology in his differential diagnosis.  He has no exposure data of any kind on which to base his opinions.  (Gots Aff., at ¶ 20.)  Dr. McMahon misinterprets the inspection report of Mr. Rucker.  As Dr. Gots explains, the "bottom line of this causation analysis is that there is clear evidence against specific causation.  The car played no role, except a perceived one, in Ms. Beckemeyer's illnesses or symptoms.  (Gots Aff., at ¶ 17, Pgs. 8-9.) "Defining exposure based on symptoms as Dr. McMahon has done is known as 'backwards toxicology', a classic error made by those with no real expert knowledge of toxicology.  Dr. McMahon's attempt to 'reverse extrapolate' the presence of mold and/or mold levels in the vehicle is fatally flawed as it is not based on accepted methodology for determining specific causation and as a result his opinions in this regard are invalid and cannot be relied upon."  (Saxon Aff., at ¶ 10.)

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and those expressed in the attached Affidavits of Dr. Gots, Dr. Saxon, Jeremy Porter and Dr. Chiodo, Dr. McMahon's opinions, methodology, and conclusions are utterly unreliable, are irrelevant and are not scientifically based such that they must be excluded under *Daubert* and the above-cited authorities.

Respectfully submitted,

*/s/Colin P. Sammon*
MICHAEL A. PAGLIA, ESQ. (0070542)
COLIN P. SAMMON, ESQ. (0076011)
**RITZLER COUGHLIN & PAGLIA, LTD.**
1360 East Ninth Street
1000 IMG Center
Cleveland, OH 44114
Office (216) 241-8333
Facsimile (216) 241-5890
csammon@rcp-attorneys.com

*Attorneys for Defendant Gelco Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2019 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/Colin P. Sammon*
COLIN P. SAMMON (0076011)